UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

SILAS BENJAMIN PARKS,

                 Petitioner,

vs.

TEREMA CARLIN,

                 Respondent.

Case No. 1:18-cv-00260-REB

**MEMORANDUM DECISION
AND ORDER**

      Petitioner Silas Benjamin Parks, through counsel Greg S. Silvey, filed a Petition for Writ of Habeas Corpus challenging his state court conviction. (Dkt. 1.) Respondent filed an Answer and Brief in Support of Dismissal, and Petitioner filed a Reply. (Dkts. 11, 14.) All named parties have consented to the jurisdiction of a United States Magistrate Judge to enter final orders in this case. (Dkt. 8.) *See* 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73.  The Court takes judicial notice of the state court records lodged by the parties. Fed. R. Evid. 201(b); *Dawson v Mahoney*, 451 F.3d 550, 551 (9th Cir. 2006).

      Having reviewed the arguments of the parties and the record in this matter, including the state court record, the Court enters the following Order denying the Petition and dismissing this case with prejudice.

**MEMORANDUM DECISION AND ORDER - 1**

## FACTUAL BACKGROUND

Petitioner lived with his pregnant wife, Sarah Parks, in Moscow, Idaho. On the morning of June 24, 2009, Petitioner's wife's body, burned beyond recognition, was found in their apartment while Petitioner was at Anytime Fitness, a local fitness center, working out. After Petitioner was charged with the death of his wife and unborn daughter, he told his attorney, Ray Barker, a story implying that Petitioner had accidentally killed his wife. Mr. Barker testified at the post-conviction hearing:

> He told me that his memory was very vague, he told me that he did remember that morning, he wanted to sleep in, Sarah didn't want him to sleep in and kept trying to wake him up. He was frustrated with that. He told me at one point he had recollections of seeing his hands around her throat. He told me that he – I believe he told me that at some point he realized that she was not responding, he attempted CPR on her, he tried to revive her. When he couldn't revive her, he put her on the bed, lit the comforter on fire, I believe that's where he said the fire started, with a charcoal grill lighter, and ran out of the house.

(State's Lodging B-8, p. 303.) The time frame when Petitioner told that to Barker was disputed, but the Idaho Court of Appeals found that Petitioner told Barker before they began mediation proceedings.

Similar to the story told to Barker, during the psychological evaluation done in preparation for sentencing, Petitioner told psychologist Dr. Beaver the same story. Dr. Beaver testified at sentencing that Petitioner told him that:

> Sarah ... was trying to wake him up in the morning, that she pushed him, that she may have struck him, that he struck back, that he has some recollection of his hands around her throat. That at some point he realized that she was unresponsive and he attempted CPR, and then he realized that

> in his mind she was dead. And so he put her – picked her up,
> put her on a bed in the guest room and then lit the bed on fire.

(State's Lodging B-2, p. 50.)

After sentencing, Lance Hart, the arson investigator wanted to validate his theory of the fire origin. He asked counsel for permission to approach Petitioner and then asked Petitioner how the fire started. Hart testified at the post-conviction hearing that Petitioner told him:

> [H]e woke up that morning and ... he was in bed with
> Sarah, they got into an argument and that he choked her, and
> then he said that he didn't mean to cause her death. He said
> that he tried to resuscitate her, but it was too late. He said that
> he then moved her body to the spare bedroom, and he
> initiated the fire at the end of the bed which was consistent
> with where we determined the area of fire origin to be.

(State's Lodging B-8, p. 246.)

At  the post-conviction hearing, Petitioner clarified that he didn't tell Hart he "choked" Sarah; he told him he had a "hazy image of his hands around Sarah's neck." (State's Lodging B-8, pp. 377-80.) Petitioner told Hart that he had set the fire with a gas grill butane lighter, by lighting the edge of the comforter that was hanging over the bed. (*Id*., p. 378.) In addition, Petitioner said he told Hart:

> I could remember Sarah on the floor, crying over her, begging
> and pleading with her to wake up, trying to resuscitate her,
> but that I didn't actually remember carrying her to the other
> bedroom. That I didn't remember getting the lighter or
> putting the lighter away, but I did remember setting the fire.
> And I did remember hearing the alarm go off almost
> immediately. I told him that I did not remember actually
> leaving, but recalled being part way to the gym.

(*Id*., p. 380.)

**MEMORANDUM DECISION AND ORDER - 3**

However, throughout the case, except when he was trying to obtain a reduction of his sentence, Petitioner has persisted in saying that he does not remember anything that happened, that the evidence does not show that he strangled his wife to death, and that there are other explanations for her death.

On the morning of June 24, 2009, after Petitioner started the fire, he got in his car and drove to Anytime Fitness, which was three and a half minutes away. He swiped his membership card to obtain entrance into the Anytime Fitness facility at about 7:39 a.m. At about 7:45 a.m., a witness noted fire and smoke coming from the Parks' duplex; she called 911 at 7:48 a.m. Firefighters responded to the scene minutes later. By that time, Sarah Parks' body was already burned beyond recognition. She was found in the guest bedroom of the residence.

Petitioner arrived back at the residence at 8:15 a.m. He told a University of Idaho student at the scene that he had been trying to call his wife. Authorities examined both of the Parks' phones and did not see a call from Petitioner to his wife during that time frame. Parks explained this by saying he had actually asked a friend to try to call his wife.

Dr. Jeffery Reynolds performed an autopsy on Sarah and the unborn child, who about 19-20 weeks old. In the autopsy report, he described the condition of Sarah's body:

> Body is that of a phenotypic female heavily charred over the entire body. The back is slightly more preserved than the rest of the body, consistent with body habitus as found. Hands are completely incinerated, and feet in the classic pugilistic contraction posture, and all extremities burned down to the bone.... Any evidence of superficial trauma has been destroyed by thermal damage. Despite the thermal destruction of most of the anterior structures of the neck, the

**MEMORANDUM DECISION AND ORDER - 4**

hyoid bone is present and is intact throughout and shows no evidence of fracture or peri-bone hemorrhage.

(State's Lodging B-4, p. 153.)

Dr. Reynolds testified about his analysis of the cause of death in deposition:

Q.      Do[] [the circumstances surrounding death] aid your autopsy?

A.      [W]hen I found out the fire didn't cause the death, now you start looking for any evidence of mechanical injury, you know, gunshot wounds, stabbing wounds, broken bones, all those sort of things, none of which were present. And what you're trying to do is narrow down the possibilities of what can cause death without leaving any evidence.

That's drugs or suffocation, you know, hypoxia, basically. Put a plastic bag over the head and remove the plastic bag, or somebody else will because you'll be dead. So suffocation or strangulation, strangulation would leave evidence in an intact body, but the neck area was completely burned. So you can strangle somebody and leave no evidence in this case, which is why I said the cause of death was probable, because I did not have the tox report at the time this report was issued. The tox report ruled out the drugs. So it's not an overdose of drugs that caused her death.

So we're talking about it's something that denied oxygen. There were findings in the autopsy that said that their breathing stopped before their heart stopped, and that's because the brain drives your breathing. The heart is autonomous. It doesn't use your brain, and the brain dies first of a lack of oxygen. So she stopped breathing for minutes before her heart stopped. So that's why I said the probable suffocation or strangulation.

Q.      Is there a point in your examination that you were able to determine that she had died prior to the fire?

A.      When you first open the body, the fact that the blood in the blood vessels is not cherry red from carbon monoxide, that it looks like old blood, you kind of say, Okay. That makes it unlikely carbon monoxide's fault.

**MEMORANDUM DECISION AND ORDER - 5**

> But there's other things that you can inhale in fires that do bad things to you, but she didn't even have soot or any evidence of smoke inhalation in her lungs. There's no inflammatory response. There's no evidence she was breathing hot air. So you kind of go, Okay. The fire's not the problem.

(State's Lodging B-7, pp. 64-65.)

Petitioner's trial counsel, Ray Barker and Charles Kovis, began investigations and preparations for trial. Lance Hart, the State's fire expert, opined that "the fire was not started by accident, but by the introduction of an open flame to available fuels and/or to introduced fuels." (State's Lodging C-4, p. 5.) Defense counsel hired a fire investigator, Mr. Butterfield, who had some divergent opinions from the State's experts, but whose opinion ultimately was deemed not helpful; they decided they did not want him to write a report. (State's Lodging B-8, p. 332.) At the beginning of the case, counsel were in the early stages of employing a pathologist to testify at trial. They consulted Thomas M. Donndelinger, M.D., of Nampa, Idaho, who informed them that he could review the autopsy report and give them an opinion, but that he no longer testified at trial. Because finding a *trial* expert was their goal, they continuing searching. They consulted with Todd C. Grey, M.D., the chief medical examiner for the state of Utah. Dr. Grey said he would be willing to review the records and testify at trial.

In addition, counsel researched bringing on a pharmacologist, Dr. Campbell from WSU School of Pharmacology, because Petitioner reported that Sarah had been coughing the evening before her death due to her asthma and had left the master bedroom to sleep

**MEMORANDUM DECISION AND ORDER - 6**

in the guest bedroom so as not to disturb his sleep.. (*See* State's Lodging B-8.) Barker also went to the duplex with their investigator twice to view the scene. (*Id*., p. 294.)

Petitioner's trial counsel had also received discovery materials from the State. Both of Petitioner's parents said he had a "sudden temper" (State's Lodging B-2, p. 50), and Petitioner himself described it as "seeing red." (State's Lodging B-8, p. 160.)  He admitted to having previously punched holes in the walls, before and after marriage. (*Id*.) At one point, he had described himself as being "part angel, part demon." (*Id*., p. 162.)

Petitioner's trial counsel also learned that Petitioner had been involved in three physical altercations with Sarah several years prior to her death. Petitioner had been charged with domestic violence as a result of the third incident; he had plea-bargained it down to disturbing the peace. He had gone to domestic violence counseling as a result of the third incident.[1]

Before Dr. Grey was retained to review the pathology associated with the death of the victims, Petitioner and his counsel participated in mediation with the State. The State offered to lower the criminal charges from two counts of first degree murder to two counts of voluntary manslaughter if Petitioner would plead guilty to those counts and the arson count. Both Barker and Kovis thought that the offer reflected the best that Petitioner could do after a jury trial and thought that the plea would avoid a life sentence

---

[1] Two years prior to her death, Sarah had had a "marital indiscretion"—"some sort of a relationship with another man"—that Petitioner partially attributed to "the hurt [he] had caused her in the first year of marriage" [and] "the emotional trauma of [him] physically lashing out at her, pushing her down." (State's Lodging B-8, pp. 211-13.)

**MEMORANDUM DECISION AND ORDER - 7**

on first degree murder convictions. In addition, a legal expert, Tom Clark, also testified that the evidence against Petitioner was strong. Clark opined that "given the fire, I think that a jury isn't going to have any sympathy for that nature of the conduct, and I think it's very probable that that would happen [Petitioner would have been convicted of first degree murder]. (*See* State's Lodging B-8, pp. 284-85; B-6, pp. 3, 302.)

Upon the advice of trial counsel, Petitioner pleaded guilty to and was convicted of two counts of voluntary manslaughter and one count of first degree arson for strangling or asphyxiating his pregnant wife and then setting fire to the bedroom. Latah County Second Judicial District Judge Jeff M. Brudie presided over pretrial, sentencing, and post-conviction proceedings. Judge Brudie sentenced Petitioner to fifteen years fixed and fifteen years indeterminate on each manslaughter charge, to run concurrently with each other, and five years fixed, with twenty-five years indeterminate on the arson charge, to run consecutively to the manslaughter sentences. That means Petitioner must serve twenty years in prison before being eligible for parole, and a total of forty years if he is not granted parole. (State's Lodging B-2, pp. 135-36.) Judgment was entered on September 2, 2010.

As part of the plea agreement, Petitioner did not file a direct appeal. He filed a Rule 35 motion for reduction of sentences.  In attempting to convince the court to reduce his sentences, Petitioner wrote:

> Dear Judge Brudie:
>
> I have learned a great deal about myself and my explosive anger problem in my short time in prison. Unfortunately, the prison system does not do programming,

like anger management, until shortly before an inmate's
release date. I would not wish to wait nineteen years before I
start working on my problem. I would not even wait six years.
I want this problem, this order [sic], this source of horror, to
be utterly eradicated from my life as soon as possible. To that
end, I have been delving through the library here for any and
all resources pertaining to anger. The information I have
come across has been surprisingly enlightening and helpful in
understanding why I came to the point I did.

   *   *   *

   I was having minor bouts of sudden anger that slowly
built up until 2006, when I hurt my wife. I then redoubled my
efforts to repress my anger and it just continued to build
pressure until it erupted that morning of June 24, 2009.

(State's Lodging B-1, pp. 41-42.) Judge Brudie denied the motion to reduce the

sentences.

Petitioner was appointed new lawyers for his post-conviction action. In

preparation for that action, his lawyers retained Dr. Jonathan L. Arden, a Virginia

pathologist, to review the autopsy findings. Dr. Arden challenged Dr. Reynolds' autopsy

procedures as incorrect and his causal analysis as outdated, erroneous, and speculative.

Dr. Arden said that "Dr. Reynolds did not weigh any of the organs, and, in fact,

weight [of] the organs is part of the procedures that really should be required in any

forensic autopsy, and that wasn't done in this instance." (State's Lodging B-8, pp. 34-35.)

Dr. Reynolds explained in deposition why he did not weigh the organs:

   Well, she'd been cooked. Unless I saw that an organ was
   abnormally small or abnormally large, in which case I'd
   weigh it, the weight of the organs is going to be distorted by
   the fact that there's thermal damage in the body. Both the
   chest and the abdominal cavity were violated by fire, so they
   were open to the air, and they'd been open to the air for days
   before I did the autopsy, or at least a day or two, so there's all
   kinds of moisture exchange going on, so the weights just

**MEMORANDUM DECISION AND ORDER - 9**

aren't accurate. They don't tell me much. It's a number, but
it's not data.

(State's Lodging B-7, p- 67-68.) Dr. Arden responded that he still believed the organs

would have told something had they been weighed, even if thermally damaged. (State's

Lodging B-8, pp. 37-38.)

Dr. Arden said that Dr. Reynolds' use of pulmonary congestion as a basis for

making a judgment that Sarah and the fetus had respiratory arrest before cardiac arrest is

not supported in his field and he has not seen it used in over 30 years of being a

pathologist. Pulmonary congestion actually means very little, and it is exceedingly

common at autopsy, Dr. Arden testified at the post-conviction evidentiary hearing.

(State's Lodging B-8, p. 68.)

On the topic of petechia hemorrhaging, Dr. Reynolds had opined:

> The petechial hemorrhages that you see on the
> maternal pleural and fetal epicardium, those are what
> you see when people stop breathing while they still
> have a blood pressure. The oxygen starts to damage
> tissue and the blood vessels can start to leak blood.
>
> You can also see that in a crush injury for different
> reasons, which is a pressure pulse, which didn't
> happen in this case. So basically the respiratory arrest
> prior to cardiac arrest, I added that subheading
> because that's one of the things that told me that's
> what happened. The petechial hemorrhages in the
> thoracic area of both the child and the mother implied
> they both had a blood pressure when oxygen was
> denied to their system and things started to die. The
> heart will keep going for ten minutes, so it's pretty
> tough.

(State's Lodging B-7, p. 70.)

**MEMORANDUM DECISION AND ORDER - 10**

But Dr. Arden disagreed: While "petechia hemorrhages that were described in this autopsy involved internal surfaces of membranes in the body of Ms. Parks and in the body of her fetus" (State's Lodging B-8,  pp. 45-46), "petechia hemorrhages in those locations ... are not the types of locations that are indicative of an asphyxial death." (*Id*.) Dr. Arden concluded, "that was a piece of evidence that was misinterpreted by Dr. Reynolds to support that conclusion. (*Id*., p. 44.)

Dr. Arden did agree with Dr. Reynolds that Sarah's death was not caused by drugs, alcohol, other chemical causes, gunshot wounds, stab wounds, asthma, broken bones sustained during life, drowning, other diseases, a fixed blockage of airway (such as by food), soot in her airways, thermal damage to her airways, or carbon monoxide in her blood. Dr. Arden opined that there was no positive evidence of strangulation[2] or suffocation to support Dr. Reynolds' conclusions as to the causes of death, but Dr. Arden could not eliminate them as causes of death. (*Id*., pp. 106-08.)

Based upon Dr. Arden's report, Petitioner brought a post-conviction ineffective assistance of counsel claim against Attorneys Barker and Kovis, asserting that they should have obtained an independent pathology report before advising Petitioner to plead guilty. Petitioner also brought a state law claim based on a state statute not at issue in this federal action. After an evidentiary hearing, Judge Brudie denied the post-conviction petition. The Idaho Court of Appeals affirmed, and the Idaho Supreme Court denied Petitioner's petition for review. That action concluded in June 2018.

---

[2] For example, Dr. Arden said the hyoid bone of the neck can be broken in strangulation, but it was found intact in Sarah's neck.

**MEMORANDUM DECISION AND ORDER - 11**

In his federal Petition for Writ of Habeas Corpus, Petitioner brings three ineffective assistance of trial counsel claims based upon the report of Dr. Arden, which the Court will now address.

## STANDARDS OF LAW

### 1.  AEDPA Deferential Review Standard

Federal habeas corpus relief may be granted where a petitioner "is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). A challenge to a state court judgment that addressed the merits of any federal claims is governed by Title 28 U.S.C.§ 2254(d), as amended by the Anti-terrorism and Effective Death Penalty Act of 1996 ("AEDPA").

The AEDPA limits relief to instances where the state court's adjudication of the petitioner's claim:

1.    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

2.    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

28 U.S.C. § 2254(d). A federal habeas court reviews the state court's "last reasoned decision" in determining whether a petitioner is entitled to relief. *Ylst v. Nunnemaker*, 501 U.S. 797, 804 (1991).

As to the facts, the United States Supreme Court has clarified "that review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 180 (2011); 28 U.S.C.

**MEMORANDUM DECISION AND ORDER - 12**

§2254(e)(2). This means that evidence not presented to the state court may not be introduced on federal habeas review if a claim (1) was adjudicated on the merits in state court and (2) the underlying factual determination of the state court is not unreasonable. *See Murray v. Schriro*, 745 F.3d 984, 999 (9th Cir. 2014). In such case, a "determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner must show, by clear and convincing evidence, that the factual findings are not just erroneous, but unreasonable, in light of the evidence presented to the state courts. 28 U.S.C. § 2254(e)(1); § 2254(d)(2).

In *Pizzuto v. Yordy*, the Ninth Circuit reiterated the high standard for such a showing:

> Under § 2254(d)(2), we may not characterize a state court's factual determinations as unreasonable "merely because [we] would have reached a different conclusion in the first instance." *Brumfield*, 135 S. Ct. at 2277 (alteration in original) (quoting *Wood v. Allen*, 558 U.S. 290, 301, 130 S.Ct. 841, 175 L.Ed.2d 738 (2010)). "Instead, § 2254(d)(2) requires that we accord the state trial court substantial deference." *Id*. "If '[r]easonable minds reviewing the record might disagree about the finding in question, on habeas review that does not suffice to supersede the trial court's ... determination.'" *Id*. (alterations in original) (quoting *Wood*, 558 U.S. at 301, 130 S.Ct. 841).

947 F.3d 510, 530 (9th Cir. 2019).

Where a petitioner contests the state court's legal conclusions, including application of the law to the facts, § 2254(d)(1) governs. That section consists of two alternative tests: the "contrary to" test and the "unreasonable application" test.

Under the first test, a state court's decision is "contrary to" clearly established federal law "if the state court applies a rule different from the governing law set forth in

[the Supreme Court's] cases, or if it decides a case differently than [the Supreme Court] [has] done on a set of materially indistinguishable facts." *Bell v. Cone*, 535 U.S. 685, 694 (2002).

Under the second test, to satisfy the "unreasonable application" clause of § 2254(d)(1) the petitioner must show that the state court—although it identified "the correct governing legal rule" from Supreme Court precedent—nonetheless "unreasonably applie[d] it to the facts of the particular state prisoner's case." *Williams (Terry) v. Taylor*, 529 U.S. 362, 407 (2000). "Section 2254(d)(1) provides a remedy for instances in which a state court unreasonably *applies* [Supreme Court] precedent; it does not require state courts to extend that precedent or license federal courts to treat the failure to do so as error." *White v. Woodall*, 572 U.S 415, 426 (2014).

Though the source of clearly established federal law is only found in the holdings of the United States Supreme Court, circuit precedent may be persuasive authority for determining whether a state court decision is an unreasonable application of Supreme Court precedent. *Duhaime v. Ducharme*, 200 F.3d 597, 600-01 (9th Cir. 1999). However, circuit law may not be used "to refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that th[e] [Supreme] Court has not announced." *Marshall v. Rodgers*, 569 U.S. 58, 64 (2013).

Like the deference due state court findings of fact, a federal court cannot grant habeas relief simply because it concludes in its independent judgment that the state court's legal conclusions are incorrect or wrong; rather, the state court's application of federal law must be objectively unreasonable to warrant relief. *Lockyer v. Andrade*, 538

U.S. 63, 75 (2003); *Bell v. Cone*, 535 U.S. at 694. That is, if fairminded jurists could disagree on the correctness of the state court's decision, then relief is not warranted under § 2254(d)(1). *Harrington v. Richter*, 562 U.S. 86, 101 (2011). The Supreme Court emphasized that "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id*. (internal citation omitted).

### 2. De Novo Review Standard

In some instances AEDPA deferential review under § 2254(d)(1) does not apply: (1) if the state appellate court did not decide a properly-asserted federal claim, (2) if the state court's factual findings are unreasonable under § 2254(d)(2), or (3) if an adequate excuse for the procedural default of a claim exists. In such instances, the federal district court reviews the claim de novo. *Pirtle v. Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2002). As in the pre-AEDPA era, a district court reviewing a claim de novo can draw from both United States Supreme Court and circuit precedent, limited only by the non-retroactivity rule of *Teague v. Lane*, 489 U.S. 288 (1989).

Under de novo review, if the factual findings of the state court are not unreasonable, then the Court must apply the presumption of correctness found in 28 U.S.C. § 2254(e)(1) to any facts found by the state courts. *Pirtle*, 313 F.3d at 1167. Conversely, if a state court factual determination is unreasonable, or if there are no state court factual findings, the federal court is not limited by § 2254(e)(1) and the federal district court may consider evidence outside the state court record, except to the extent that § 2254(e)(2) might apply. *Murray v. Schriro*, 745 F.3d 984, 1000 (9th Cir. 2014).

### 3.  Harmless Error Standard

Even if a petitioner succeeds in demonstrating a constitutional error in his conviction under any of the above standards, federal habeas relief is available only if the petitioner "can establish that [the error] resulted in 'actual prejudice.'" *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993). Under the *Brecht* standard, an error is not harmless, and habeas relief must be granted, only if the federal court has "grave doubt about whether a trial error of federal law had substantial and injurious effect or influence in determining the jury's verdict." *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995) (punctuation altered). However, some types of claims "are analyzed under their own harmless error [or prejudice] standards, which can render *Brecht* analysis unnecessary." *Jackson v. Brown*, 513 F.3d 1057, 1070 (9th Cir. 2008). Ineffective assistance of counsel claims are included in this category. *Musladin v. Lamarque*, 555 F.3d 830, 834 (9th Cir. 2009).

### 4.  Ineffective Assistance of Counsel Standard of Law

As recognized by Judge Brudie and the Idaho Court of Appeals, the clearly-established law governing a Sixth Amendment claim of ineffective assistance of counsel is found in *Strickland v. Washington*, 466 U.S. 668 (1984). *Strickland* dictates that, to succeed on an ineffective assistance claim, a petitioner must show that (1) counsel's performance was deficient in that it fell below an objective standard of reasonableness, and that (2) the petitioner was prejudiced by the deficient performance. *Id*. at 684.

In assessing trial counsel's performance under *Strickland*'s first prong, a reviewing court must view counsel's conduct at the time that the challenged act or

omission occurred, making an effort to eliminate the distorting lens of hindsight. *Id*. at

689. The court must indulge in the strong presumption that counsel's conduct fell within

the wide range of reasonable professional assistance. *Id*.

In assessing prejudice under *Strickland*'s second prong, a court must find under

the particular circumstances of the case that there is a reasonable probability, but for

counsel's errors, the result of the proceeding would have been different. *Id*. at 684, 694.

A reasonable probability is one sufficient to undermine confidence in the outcome. *Id*. at

694.

Both deficient performance and prejudice must be established to prove an

ineffective assistance of counsel claim. 466 U.S. at 697. On habeas review, the court may

consider either prong of the *Strickland* test first, or it may address both prongs, even if

one is deficient and will compel denial. *Id.*

The foregoing standard, giving deference to counsel's decisionmaking, is the de

novo standard of review. As explained above, another layer of deference—to the state

court decision—is afforded under AEDPA. In guiding district courts reviewing

*Strickland* claims on habeas corpus review, the United States Supreme Court explained:

> The pivotal question is whether the state court's application
> of the *Strickland* standard was unreasonable. This is different
> from asking whether defense counsel's performance fell
> below *Strickland*'s standard. Were that the inquiry, the
> analysis would be no different than if, for example, this Court
> were adjudicating a *Strickland* claim on direct review of a
> criminal conviction in a United States district court. Under
> AEDPA, though, it is a necessary premise that the two
> questions are different. For purposes of § 2254(d)(1), "an
> unreasonable application of federal law is different from an
> incorrect application of federal law." *Williams*, *supra*, at 410,

**MEMORANDUM DECISION AND ORDER - 17**

> 120 S.Ct. 1495. A state court must be granted a deference and
> latitude that are not in operation when the case involves
> review under the *Strickland* standard itself.

*Harrington v. Richter*, 562 U.S. 86, 112 (2011).

## REVIEW OF PETITION FOR WRIT OF HABEAS CORPUS

### 1. Discussion of Claim 1

Petitioner asserts that trial counsel was ineffective for failing to retain a forensic pathologist to challenge the conclusions of the state autopsy report with regard to Sarah's cause of death before advising him to plead guilty. (Dkt. 1, p. 5.) This claim was decided on the merits by the Idaho Court of Appeals and, in its denial of the petition for review, by the Idaho Supreme Court. Therefore, the Idaho Court of Appeals' decision is entitled to AEDPA deference. *See Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018) ("[A] federal court should 'look through' [an] unexplained decision to the last related state-court decision that does provide a relevant rationale. It should then presume that the unexplained decision adopted the same reasoning.").

On post-conviction appellate review, the Idaho Court of Appeals first noted that "Parks does not assert that the district court factual findings are erroneous, so our review is limited to the district court's application of the relevant law to the facts." (State Lodging C-4, p. 3.) The Idaho Court of Appeals then addressed the deficient performance prong of *Strickland*. First, the appellate court pinpointed the state district court's conclusion as to deficient performance:

> The district court concluded that Parks failed to meet his
> burden of showing that trial counsel were deficient. The court
> determined that trial counsel's advice was not given due to

**MEMORANDUM DECISION AND ORDER - 18**

> lack of investigation or preparation on the part of counsel, but concluded instead that Parks' counsel investigated the case, prepared a defense, and ultimately advised Parks to accept the plea deal which significantly reduced his potential prison sentence because both attorneys saw the plea deal as the best realistic outcome for their client. We agree.

(*Id.*, p. 4.)

The Idaho Court of Appeals followed the standard of law regarding deficient performance in trial preparation, noting that "we will not second-guess trial counsel in the particularities of trial preparation." (*Id.*) The Idaho Court of Appeals then analyzed the "circumstances surrounding the attorneys' investigation," finding that the analysis:

> reveal[ed] that counsel's pretrial preparation did not fall below a level of reasonable performance. The State had strong evidence of Parks' guilt that made counsel's advice to accept the State's plea offer objectively reasonable. Parks told authorities that he had woken up at 6:45 a.m., checked on his wife, and then left at about 7:20 a.m. to drive to a fitness facility to workout. However, it only takes approximately three and one-half minutes to drive from the Parks' residence to the fitness facility, and authorities were able to confirm that Parks swiped his membership card at the facility's card access point at 7:39 a.m. on the morning of the fire. Additionally, the Fire Marshal's investigation concluded that the fire started between approximately 7:33 a.m. and 7:38 a.m., just ten to fifteen minutes before it was initially observed and reported by a witness and just a few minutes before Parks swiped his access card at the gym. The investigation further concluded that the fire was not started by accident, but by the introduction of an open flame to available fuels and/or to introduced fuels. Furthermore, the State pathologist concluded the cause of death was probable suffocation or strangulation because Sarah suffered respiratory arrest prior to cardiac arrest, and the pathologist discovered no evidence of infection, no mechanical trauma, and no evidence of soot or thermal damage in the respiratory tract. So, in preparation for trial, counsel hired an investigator, consulted a fire expert, and

were in the early stages of employing a pathologist who
would have testified for Parks if the case had gone to trial.

*Significantly, counsel conducted all of this preparation
despite the fact that Parks had told them prior to mediation
that he could recall his hands around Sarah's throat* and
despite the fact that Parks specifically asked trial counsel not
to pursue a defense theory based on evidence of an alternate
perpetrator.[3] Parks' counsel perceived these statements to
mean that Parks was reluctantly communicating that he did,
in fact, kill Sarah Parks. Given the circumstances surrounding
the attorneys' investigation, counsel's pretrial preparation did
not fall below a level of reasonable performance.

(State's Lodging C-4, pp. 4-6 (italics added for the following discussion.)

Petitioner asserts that the Idaho Court of Appeals made an erroneous finding of

fact because the state trial court did not itself make a finding of fact as to whether counsel

or Petitioner was more credible regarding differing testimony about whether Petitioner

told Barker *before or after* the mediation on March 30, 2010, that he vaguely

remembered his hands around Sarah's neck and that he set the fire to burn her body.

Counsel testified it was before mediation (State's Lodging B-8, pp. 303, 308), while

Petitioner testified it was after mediation.[4] (*Id.*, p. 338.) The Court will therefore review

the record to determine whether it supports the Idaho Court of Appeals' finding of fact

that the conversation occurred before mediation.

---

[3] See testimony of Charles Kovis in State's Lodging B-8, p. 334: "In going through the discovery and
talking with Mr. Barker, receiving letters from a local pastor Mr. Jim Wilson, there may have been an
alternative perpetrator, I don't know whether it would be appropriate to give his name; but when I read
that, I kind of thought, wow, you know, this is a potential – you know, another suspect. And I was really
wanting to go down that path and Mr. Parks told me not to."
[4] Mediation and the change of plea hearing were on the same day.

**MEMORANDUM DECISION AND ORDER - 20**

Barker testified at the post-conviction hearing that he had taken notes of what Petitioner said, the notes were not dated, he could not remember the date of the conversation, but he knew that the notes were made before the mediation because, he said, "I do know that I had that information going into the mediation." (State's Lodging B-8, p. 308.) He testified that he attempted to discuss what happened on the morning of the fire with Petitioner prior to the mediation, but he couldn't recall Petitioner telling him anything except the "hands around the throat" statement and  "I can't remember anything." (*Id.*, pp. 308-09.) At the time of mediation, Barker testified, his belief regarding the cause of Sarah's death was that Petitioner had strangled her, and that was because of the statement Petitioner made to him about seeing his hands wrapped around her throat. (*Id.*, p. 316.) Barker spoke with Petitioner more frequently when he was in jail (Petitioner was released on bail between the change of plea hearing and sentencing hearing). (*Id.*, p. 319.) On re-cross examination Barker was asked if it was possible that his undated notes were created after mediation. He said "no" because "I know going into the mediation, prior to that he had made the comment of seeing his hands wrapped around her throat." (*Id.*, p. 321.)

Charles Kovis testified that he was not originally appointed to represent Petitioner, but was brought in later, at a time when Petitioner was still in custody prior to the change-of-plea hearing. (*Id.*, p. 328.) Kovis testified: "I never ask my clients whether they did it or not because I don't care." (*Id.*, p. 335.)

Kovis testified:

**MEMORANDUM DECISION AND ORDER - 21**

> Silas has never told me that he did it. I believe prior to
> mediation that I had spoken with Mr. Barker, and he said that
> Silas told him that he had recollections of either being on top
> of his wife with his hands around her neck or something like
> that, and I was like, okay, I can understand that.

(*Id*., p. 341.)

However, because Parks told him not to pursue an alternative suspect named

"Phillip" suggested by Parks' pastor, Kovis said, "[I]t certainly would make me think that

if I wasn't going to be able to go after somebody else, there must be a reason why." (*Id*.,

p. 335.) Kovis testified about his post-preliminary hearing and pre-mediation thought

processes about a defense strategy, with Parks having told him not to pursue "Phillip."

> Well, having read the autopsy report where it said that
> the lady and child were – didn't have any soot in their lungs,
> that they were dead before the fire, you know, it – basically
> I'm looking at something like that saying, well, what are the
> potential avenues, how logically can you figure this out. And
> I was kind of – you know, when I heard that she had had
> asthma and things like that and had coughed at night when
> she was sleeping, that there was also asthma medication, I
> think, in the house, I thought maybe, you know, that she had
> an asthma attack or something. The autopsy basically said
> that didn't happen, but I thought maybe we could go that
> route.
>
> The biggest problem I had with that, though, was about
> the fire, I mean. Okay. So in my mind, I  guess I was thinking
> that charge was first degree murder which carries a
> mandatory ten to life sentence, along with the arson first
> degree, that in my own mind, that it might have been a
> voluntary manslaughter which is unlawful killing of a human
> being upon sudden quarrel or heat of passion.
>
> And, you know, I have talked to Mr. Parks many,
> many times, he just never seemed like a person who would
> commit a first degree murder premeditation or torture. And I
> thought something must have happened; what, I don't know. I

**MEMORANDUM DECISION AND ORDER - 22**

mean I'm not a grumpy person when I wake up, but you'd have to be pretty damn grumpy to start a fire and burn somebody up that early in the morning, but that's not me.

And I always thought that if we went to trial and could get a voluntary manslaughter, that would be the absolute best that could ever happen at trial. And my biggest fear, my absolute biggest fear was always the fire. Because the judge can instruct the jury that you have to premeditate for first degree murder, and that a jury would look at the fire and the callousness of going over and working out while the fire is going, as if somebody who did that after the fact, and then they probably were mean enough or  they wouldn't – they would disregard the judge's instructions to not think about what happened afterwards, but you could only think about what happened forwards. And that was – that was my absolute biggest worry.

And then I was also kind of worried that maybe the jury would think that throwing gas on somebody and lighting them on fire could be torture which is pretty much implied first degree murder. And my goal, as far as a goal is concerned, was as Silas' lawyer is I wanted to have him have his feet on the street as soon as he could ultimately.

(State's Lodging B-8, pp. 336-38.)

Petitioner, on the other hand, testified in rebuttal that he told Barker about his "hands on the throat" after mediation and his change of plea: "I know that the first that I told anyone of my full recollection of what had happened that morning was in the presentence investigation packet; and before I had given it to Mr. Barker, I let me [sic] parents read it. And my parents noted that to the presentence investigator and that is in the presentence investigation report." (*Id*., pp. 384-85.) He discussed that his parents did not know before the change of plea hearing that he was going to plead, and "at that point in time "she believed I had no knowledge of what had happened to Sarah." (*Id*., p. 384.)

**MEMORANDUM DECISION AND ORDER - 23**

Petitioner used Barker's notes and the lawyers' billing records to attempt to aid his memory. Petitioner said he believed the notes were from a meeting with Barker *and* Kovis. (*Id.*, pp. 385, 388-89.)

However, Barker and Kovis believe that Petitioner told Barker, and then Barker told Kovis. Barker often came to see Petitioner alone in jail when Barker was the only attorney assigned to the case. (*Id.*, p. 395.) Barker and Kovis began work on the case at different times and had different philosophies about discussing whether the defendant had committed the crime. The scenario that Petitioner told Barker, Barker took notes, and then Barker told Kovis is more indicative of the timeframes when each counsel began working on the case and more indicative of their different philosophies about discussing guilt.

Petitioner argues that the Idaho Court of Appeals' statement of fact that Petitioner told his trial counsel *prior to mediation* something about recalling his hands around Sarah's throat is an unreasonable finding of fact because the state trial court did not make that finding. However, on federal habeas review, the findings of fact of the state appellate court (and the state district court findings of fact *not in conflict with state appellate court findings of fact*) are entitled to AEDPA deference. *See James v. Ryan,* 733 F.3d 911, 916 (9th Cir. 2013) (noting that *Johnson* "does not require us to ignore a state court's explicit explanation of its own decision"); *Ylst v. Nunnemaker*, 501 U.S. 797, 804 (1991) (we look "to the last reasoned decision" resolving a claim).

The Idaho Court of Appeals is entitled to make different findings of fact from the trial court, and those are the primary facts this Court is required to review. This finding of

fact by the Idaho Court of Appeals does not contravene any finding of fact or conclusion of the trial court. It is simply an additional finding of fact that is supported by the record. Hence, the Court concludes that this is a reasonable finding of fact based on the totality of the testimony of Petitioner, Barker, and Kovis at the hearing; the reasonable inferences drawn from that testimony; and the other facts found in the record, including the transcript of the evidentiary hearing held by the state district court.[5]

As to the question of the timing of hiring a defense pathology expert, Kovis testified that, from the time he first read the autopsy report, he did feel the need to have an expert for the defense. "Any time the state has an expert, the Defense should have an expert to rebut it," he said. (*Id.*, p. 344.) However, Kovis knew that he was "stuck with" certain findings of the autopsy, because once the person has been buried, another expert cannot re-examine the body. Kovis said he knew he couldn't change the fact that Dr. Reynolds found no soot in Sarah's lungs. He said his "heart sank" when he read that, because it led to a logical conclusion—"there's two people in the house, somebody dies, gets set on fire; who else did it." (State's Lodging B-8, p. 345.) He felt the State had a very strong circumstantial case, and, if they went to trial, there was a high probability that Petitioner would be found guilty of first degree murder. (*Id.*, p. 346.)

---

[5] Alternatively, even if  this is considered a § 2254(d)(2) error, whether Petitioner told Barker before or after the mediation is only minimally relevant to this Court's conclusion. Because of other strong evidence—pointing to Petitioner as the perpetrator of the deaths and the fire—that Barker and Kovis possessed prior to mediation, this Court concludes that the difference in factfinding does not make a difference in the outcome of this claim and is therefore harmless.

However, by the time they received the offer from the State, Kovis did not feel it was necessary to hire an expert to review the autopsy report before Petitioner entered his plea to the reduced charges, for the following reasons:

> He said he did it. If we were going to trial, I guarantee you that Mr. Gray would have testified; but if you admit you did it, I don't need to waste the County's money or the State's money going and hiring experts when there's no need.

(*Id.*, p. 346.) Kovis said he felt the same way even after reading Dr. Arden's report, because it did not change the fact that there was no smoke in Sarah's lungs. (*Id.*, pp. 346-47.)

Kovis said that he advised Petitioner that, in his experience with Lewiston judges, they did not like to take an *Alford* plea – a plea in which the defendant reserves the right to say he did not commit the crime. Kovis told Petitioner that he would "absolutely need[] to allocute" and say he did it. Kovis said if you took responsibility, you could get "15 years on the bottom," but if you said "My lawyer told me to plead guilty," or "I'm just pleading guilty just so I can get out of jail," it might mean "25 or 30 years at the bottom end." (*Id.*, p. 348.) Kovis said: "I don't ever tell my clients what to say in situation like that, I just say you need to say that you did it; and if you didn't do it, we'll go to trial." (*Id.*)

Kovis testified that he had this discussion with Petitioner, and Petitioner ultimately decided to enter into a plea to the Rule 11 agreement which was 15 years fixed at the bottom. (*Id.*) Kovis warned Petitioner prior to entering the plea that he could get a 40-

year fixed sentence, but told him that some manslaughter perpetrators have gotten as few as five years. (*Id*., pp. 344-45.)

At the post-conviction hearing, cross-examination of Kovis revealed some differences from his deposition testimony, such as (1) whether he had discussed the contents of the autopsy report with Dr. Grey ("no" at deposition, "yes ... a little bit about the autopsy but not the content of the report" at the hearing); (2) whether he ever told Petitioner, "Judge Brudie comes from the same cut of cloth as I do" ("yes" at deposition, but "no" at the hearing), and (3) whether he ever asked Dr. Beaver if he thought Petitioner was telling the truth about his absence of memory ("no, you know I don't know," at deposition, "yes, I think so" at the hearing). (*See id*., pp. 360-67.)

Having had all of this evidence before it, the appellate court reasonably found that Barker knew that Petitioner told him about recalling his hands around Sarah's neck before the mediation, and that court used it as a significant fact to support its decision. The appellate court relied on this finding of fact to support its decision that trial counsel had not performed deficiently in their pre-trial duties.

This Court agrees. As discussed above, Petitioner's counsel adequately prepared for trial, pursuing two different pathologists to find one willing to review the records and testify at trial. Petitioner's counsel quickly hired an arson expert, but that did not reap positive results for Petitioner's defense—as it was clear that the perpetrator had purposely set the fire. Petitioner's history of bouts of uncontrollable anger and violence toward property and toward Sarah were negative factors. Petitioner's estimates of timing, compared to the Anytime Fitness clock-in system, did not support his defense. The

**MEMORANDUM DECISION AND ORDER - 27**

conclusion of Dr. Reynolds failed to show any reasonable explanation for Sarah's death

other than strangulation or asphyxiation—the evidence of which the perpetrator

purposely set out to destroy.

Importantly, trial counsel knew before mediation that there would never be an

exculpatory explanation for the fire, only that Petitioner lit it to cover up the deaths—a

fact that most jurists who have been involved in this case have identified as a fact that

might have inflamed the jury. True to the motive for burning the body, no flesh was left

on Sarah's neck from which Dr. Reynolds could have found strangulation marks. Tom

Clark, the legal expert, testified:

> I think what would really bother a jury is first you have
> somebody that is willing to destroy somebody else's property,
> not their own, burn somebody's apartment house down. But
> beyond that, much, much, much more important is that you
> have somebody that commits a barbaric act of destroying the
> body of someone that they purportedly love and willing to
> burn that up, an atrocious act.

(State's Lodging B-8, p. 284.)

On post-conviction review, Judge Brudie opined: "Parks' defense attorneys clearly

recognized what Parks, and perhaps his current counsel do not: the post-death arson of

the apartment, which Parks admits, was powerful and persuasive circumstantial evidence

of having engaged in conduct which caused the death of Sarah and the unborn child. The

arson served no purpose and had no explanation other than to cover up the deaths and to

complicate an autopsy." (State's Lodging B-6, p. 231.) Judge Brudie concluded: "This

Court agrees with the testimony of Kovis, Barker, and Clark, that had Parks gone to trial

**MEMORANDUM DECISION AND ORDER - 28**

he would have likely been convicted on both counts of first degree murder, resulting in

the mandatory sentence of life in prison." (*Id*.)

As to Dr. Arden's disputes regarding the pathology evidence, the Idaho Court of

Appeals found the following facts. Petitioner asserts that the italicized portions of the

statement constitute unreasonable findings of fact:

> Moreover, the district court concluded that Parks had merely alleged that counsel may have discovered a weakness in the State's case. Parks supported his ineffective assistance of counsel claim with an affidavit and report prepared by Dr. Jonathan L. Arden, a consulting practice based in northern Virginia, after Dr. Arden had reviewed the State pathologist's report. Dr. Arden also testified at the hearing on Parks' petition for post-conviction relief. *The district court concluded that Dr. Arden's findings did not directly contradict the State pathologist's findings*. Like the State's pathologist, Dr. Arden concluded that Sarah was dead before the fire started but that asthma was not the cause of death. *The court also noted that* although Dr. Arden took issue with the pathologist's ultimate conclusion that Sarah's death resulted from "probable" suffocation or strangulation, *Dr. Arden ultimately opined that "in the absence of another obvious type of trauma to explain her death (e.g., a gunshot wound), it is reasonable to consider some form of asphyxiation as having caused her death." There is a fine distinction between the State pathologist's conclusion that Sarah's cause of death was "probable" suffocation or strangulation and Dr. Arden's conclusion that it was reasonable to consider some form of asphyxiation as having caused Sarah's death*. Nevertheless, *Dr. Arden failed to propose an alternative cause of Sarah's death*. Therefore, Parks failed to establish that the inadequacies he has complained of would have made a difference in the outcome of the proceeding.

(State's Lodging C-4, p. 6.)

Petitioner has merely highlighted the portions of the record that support his

arguments; he has not shown that the Idaho Court of Appeals made unreasonable or even

**MEMORANDUM DECISION AND ORDER - 29**

erroneous findings of fact. The state court obviously is not using the term *the [pathologists'] findings* as a legal term of art. Rather, the essence of Judge Brudie's decision was that—despite the pathologists' differences of opinion—the least common denominators between Dr. Arden and Dr. Reynolds were that (1) Sarah was dead before the fire started, (2) Sarah did not die of asthma-related conditions, and (3) because there were no other clear explanations for her death, it was reasonable to consider that Sarah could have died from suffocation or strangulation—the effects of which could have been obliterated by the perpetrator's purposeful act of burning Sarah's body. Those least common denominators are clear from the record.

Petitioner overstates Dr. Arden's opinions about the lack of evidence of strangulation—for example, the hyoid bone is not always broken in a strangulation, the tongue is not always bitten, and the voicebox is not always damaged, as Petitioner asserts. (*See* State's Lodging B-8, pp. 54-74.) In fact, if looking at this case in hindsight, as Petitioner urges this Court to do, Petitioner's own vague memories tend to show he strangled Sarah; therefore, Dr. Arden's contrary opinions contradict other evidence that Petitioner probably did strangle Sarah. Finally, the Court concludes that Petitioner's assertion that the Idaho Court of Appeals' finding of fact that "Dr. Arden failed to propose an alternative cause of Sarah's death" is erroneous—arguing that a conclusion of "unknown cause of death" *is* an alternative cause of death—does not constitute a true factual challenge; it is merely an argument, and an unpersuasive one at that, given that both pathologists ruled out so many alternative causes of death.

Upon its review of the record, this Court also agrees that, on the content of the investigation and the evidence Petitioner's counsel had gathered at the time of the mediation (not to include whether Petitioner had revealed his recollections to Barker at that time), they acted reasonably and adequately in advising Petitioner to accept the plea agreement that lowered the charges from murder to manslaughter and removed the possibility of a life sentence. Barker and Kovis firmly believed that voluntary manslaughter was equal to the best result they could have gotten at trial on the two first degree murder charges. (State's Lodging C-4, p. 8; B-8, p. 302.) The legal expert agreed.

Petitioner argues that, because Kovis said he was surprised that the offer was so favorable, he should have suspected that the State had some weakness in its case of which he was unaware. Petitioner also argues that there was little real evidence to show that Petitioner premeditated the killing, other than the obvious explanation that it took between three and five minutes to smother or strangle a person to death—a time period long enough for contemplation to occur. However, it is just as likely that the prosecutors came to the conclusion that manslaughter was a highly possible outcome, given that there were no witnesses to the crime, that the conclusion of the autopsy report was arrived at by process of elimination, and that the arson charge on top of the two manslaughter charges would still yield a fixed term of years upon a plea agreement that would satisfy justice. Both sides had some risk in going to trial, but Petitioner's counsel did not want to gamble on a life sentence, given the emotionally-charged complication of the fire.

This Court also recognizes that an another emotionally-charged issue is that the killing of Sarah caused the death of the baby—with Petitioner having been well-aware

MEMORANDUM DECISION AND ORDER - 31

that Sarah was pregnant, given that they had planned to find out the gender of the child

that very day. It was an autopsy, not an ultrasound, that revealed the child was a daughter.

Added to the baby's death was the burning of her body. Again, Petitioner's counsel were

wise in not proceeding to trial on these facts when they felt they were getting for their

client in mediation the best outcome the trial could have produced.

The Idaho Court of Appeals drew upon *McMann v. Richardson*, 397 U.S. 759,

769-70 (1970), in which the United States Supreme Court discussed the "difficult

judgments" that must be made by counsel "[i]n the face of unavoidable uncertainty"

before a jury trial." (State's Lodging C-4, p. 7. n.4.) In *McMann*, the Court reasoned:

> As we said in *Brady v. United States*, 397 U.S., at 756-
> 757, 90 S.Ct., at 1473-1474, 25 L.Ed.2d 747, the decision to
> plead guilty before the evidence is in frequently involves the
> making of difficult judgments. All the pertinent facts
> normally cannot be known unless witnesses are examined and
> cross-examined in court. Even then the truth will often be in
> dispute. In the face of unavoidable uncertainty, the defendant
> and his counsel must make their best judgment as to the
> weight of the State's case. Counsel must predict how the facts,
> as he understands them, would be viewed by a court. If
> proved, would those facts convince a judge or jury of the
> defendant's guilt? On those facts would evidence seized
> without a warrant be admissible? Would the trier of fact on
> those facts find a confession voluntary and admissible?
> Questions like these cannot be answered with certitude; yet a
> decision to plead guilty must necessarily rest upon counsel's
> answers, uncertain as they may be. Waiving trial entails the
> inherent risk that the good-faith evaluations of a reasonably
> competent attorney will turn out to be mistaken either as to
> the facts or as to what a court's judgment might be on given
> facts.
>
> That a guilty plea must be intelligently made is not a
> requirement that all advice offered by the defendant's lawyer
> withstand retrospective examination in a post-conviction

hearing. Courts continue to have serious differences among themselves on the admissibility of evidence, both with respect to the proper standard by which the facts are to be judged and with respect to the application of that standard to particular facts. That this Court might hold a defendant's confession inadmissible in evidence, possibly by a divided vote, hardly justifies a conclusion that the defendant's attorney was incompetent or ineffective when he thought the admissibility of the confession sufficiently probable to advise a plea of guilty.

In our view a defendant's plea of guilty based on *reasonably competent advice* is an intelligent plea not open to attack on the ground that counsel may have misjudged the admissibility of the defendant's confession. Whether a plea of guilty is unintelligent and therefore vulnerable when motivated by a confession erroneously thought admissible in evidence depends as an initial matter, not on whether a court would retrospectively consider counsel's advice to be right or wrong, but on *whether that advice was within the range of competence demanded of attorneys in criminal cases*.

*Id.*, 397 U.S. at 769–70 (emphasis added).

The need to avoid judging in hindsight the reasonableness of an attorney's pre-plea performance was reiterated in *Premo v. Moore*:

Whether before, during, or after trial, when the Sixth Amendment applies, the formulation of the standard is the same: reasonable competence in representing the accused. *Strickland*, 466 U.S., at 688, 104 S.Ct. 2052. In applying and defining this standard substantial deference must be accorded to counsel's judgment. *Id.*, at 689, 104 S.Ct. 2052. But at different stages of the case that deference may be measured in different ways.

In the case of an early plea, neither the prosecution nor the defense may know with much certainty what course the case may take. It follows that each side, of necessity, risks consequences that may arise from contingencies or circumstances yet unperceived. The absence of a developed or an extensive record and the circumstance that neither the

prosecution nor the defense case has been well defined *create a particular risk that an after-the-fact assessment will run counter to the deference that must be accorded counsel's judgment and perspective when the plea was negotiated, offered, and entered.*

562 U.S. 115, 126 (2011) (emphasis added). The Court went on to reason:

> A trial provides the full written record and factual background that serve to limit and clarify some of the choices counsel made. Still, hindsight cannot suffice for relief when counsel's choices were reasonable and legitimate based on predictions of how the trial would proceed. *See Richter*, 562 U.S., at 107–108, 131 S.Ct. 770.
>
> Hindsight and second guesses are also inappropriate, and often more so, where a plea has been entered without a full trial.... The added uncertainty that results when there is no extended, formal record and no actual history to show how the charges have played out at trial works against the party alleging inadequate assistance. Counsel, too, faced that uncertainty. There is a most substantial burden on the claimant to show ineffective assistance. The plea process brings to the criminal justice system a stability and a certainty that must not be undermined by the prospect of collateral challenges in cases not only where witnesses and evidence have disappeared, but also in cases where witnesses and evidence were not presented in the first place.

*Id*. at 132.

Based on all of the foregoing, the Court concludes that the Idaho Court of Appeals did not unreasonably apply the first prong of *Strickland*. Deference is required, because the Idaho Court of Appeals decided the claim on the merits. The Court concludes that Petitioner's claim fails on the merits for lack of a showing of deficient performance of counsel because they, in fact, engaged in a reasonable amount of pretrial discovery, analyzed the evidence, came up with several different strategies, recognized a good deal

when they saw one, and overall rendered reasonably competent advice. Under the deferential standard, relief is not warranted because fairminded jurists could disagree with each other on the correctness of the state court's decision.[6]

Even though Judge Brudie did not reach the prejudice prong of *Strickland*, the Idaho Court of Appeals addressed it. The Court of Appeals found no prejudice because counsel "were both unequivocally clear that they would not have changed their recommendation to accept the plea deal even if they had conclusions about the autopsy report like those in Dr. Arden's report before mediation." (State's Lodging C-4, p. 8.)

While Dr. Arden disagreed with Dr. Reynolds' procedures and causation analysis, Dr. Arden agreed that the victims died before the fire started, that Sarah's death was not asthma-related, and that there was no other reasonable explanation for the cause of death. Therefore, the opinion of Dr. Arden leads to no different conclusion than the autopsy report of Dr. Reynolds, especially when combined with the other known facts. That the fire obliterated evidence of strangulation, and that the fire obviously had been set for exactly that purpose, would not have been well-received by any jury. This Court agrees that Petitioner has failed to show that the lack of a defense pathology report prior to mediation would have made any difference in the outcome of his case or would have influenced him to plead not guilty, when his attorneys were convinced that he could have done no better at trial.

---

[6] Alternatively, the Court is confident that this  result would be the same under the de novo review standard.

**MEMORANDUM DECISION AND ORDER - 35**

To prevail under *Strickland*'s prejudice prong, a petitioner for federal habeas corpus relief must demonstrate "a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart*, 474 U.S. 52, 59 (1985). Here, Petitioner declares, unconvincingly, that Dr. Arden's opinion provided him with better information about how Sarah died, whereupon he would have resisted the plea bargain and opted for trial despite the critical evidence of the fire—despite the many contrary lawyer and judge opinions expressed in this case to date and despite his admission of responsibility for Sarah's death as a result of his sudden anger, expressed in his letter to the judge to support his reduction of sentence request.

Based on all of the foregoing, the Idaho Court of Appeals did not unreasonably apply the second prong of *Strickland*. Therefore, Petitioner's claim independently fails on the merits for failure to show prejudice resulting from his attorneys' pretrial performance.

### 2. Discussion of Claims 2 and 3

Claim 2 is that trial counsel were ineffective for failing to retain an independent forensic pathologist to investigate the cause of death during the sentencing phase. Claim 3 is that trial counsel were ineffective for failing to present a report of an independent pathologist at the sentencing hearing. Petitioner relies again on Dr. Arden's opinions, summarized above. Judge Brudie denied this claim on post-conviction review, but it was not raised on appellate review. (*See* State's Lodgings B-6, p. 212 and C-1.)

The Court begins by analyzing what was done by sentencing counsel. Petitioner's counsel hired Dr. Beaver to perform a psychological evaluation of Petitioner for rehabilitation purposes. Dr. Beaver testified that Petitioner's chances of being

rehabilitated were "excellent" and that, based on what was known about the area of

Intermittent Explosive Disorder (the State's expert's diagnosis) and the study of

individuals who have been released back into the community, that did not change his risk

analysis of Petitioner. (State's Lodging B-2, p. 43-47, 90.)

In the sentencing analysis, Judge Brudie noted: "I know Dr. Beaver's background

and he's an individual that has evaluated a great many people, and he's not without hope

for your future and that's – that is important to me." (State's Lodging B-2, p. 134.)

Petitioner's counsel advised him that taking responsibility for the deaths was

likely to yield a lesser sentence than not doing so. (State's Lodging B-8, p. 387.)

Petitioner gave an allocution and took responsibility, but offered no explanation for the

arson.

> There are no words for the horror I have caused. I can barely even handle thinking about it all. Sarah was beloved by most everyone who knew her. She was so outgoing, so very kind and thoughtful and so very beautiful. She touched the hearts and lives of many people.
>
> So what I have brought has been so devastating to so many people, her friends, her co-workers, her students, all have been hurt so much. And her family, her dear, kind, lovely family, I tore the heart out of this wonderful family. I took Sarah away from us all and Sarah who always gave so much. I'm sorry. I'm so very sorry.

(State's Lodging B-2, pp. 353-54.)

Petitioner's failure to adequately address what happened and why—contrary to

counsel's advice to Petitioner—affected the trial court's sentencing decision:

> I look over the statements that you made to the presentence investigator and I – frankly, I don't buy it. I'm

**MEMORANDUM DECISION AND ORDER - 37**

fuzzy, I don't buy it. I'm not sure. I don't buy that statement
of being half awake or pretty out of it. And the other thing
that concerns me, I guess, is something Mr. Thompson talked
about is that even on your explanation, I'm concerned once
the manslaughter had occurred, I'm really concerned with the
decision that allowed you to go to arson and that happened so
fast. So that's also another factor for me, Mr. Parks, that I
guess you have not provided to me the understanding that I
seek and certainly I don't – I don't think Sarah's family has
received the explanation that they would like.

(State's Lodging B-2, pp. 132-33.)

On post-conviction review, Judge Brudie rejected Petitioner's argument that, at

sentencing, trial counsel should have tried to show the victims' death was due to an

unknown cause by introducing a controverting pathology report, as follows:

> This Court would not have allowed a pathologist to testify
> that the cause of Sarah's death was undetermined. The ship of
> guilt or innocence had sailed with the Court's acceptance of
> Parks' guilty pleas, so such testimony at sentencing would be
> irrelevant.
>
> The Court need only consider such evidence when it would
> cast an obvious doubt on whether the defendant is in fact
> guilty. *See Fowler v. State*, 109 Idaho 1002, 1005, 712 P.2d
> 703, 706 (Ct. App. 1985). In the case before this Court, the
> testimony of Dr. Arden would not have cast obvious doubt on
> Parks' guilt.

(State's Lodging B-6, p. 210 (including footnote 10).)

This Court concludes that not only did trial counsel perform free from harmful

error at the sentencing hearing, if Petitioner had heeded the counsel of his attorneys and

provided an explanation for the arson, he may have gotten a lighter sentence. Petitioner

has failed to show either deficient performance or prejudice, and, therefore, this ineffective assistance of counsel sentencing claim fails on de novo review.

### 3. Discussion of Alternative Procedural Default Argument

Respondent alternatively argues that Claims 2 and 3 are procedurally defaulted for failure to properly present them to the Idaho Supreme Court before including them in the federal Petition. The Court agrees, but the point is moot because these claims have been rejected on the merits.

**ORDER**

**IT IS ORDERED:**

1. The Petition for Writ of Habeas Corpus (Dkt. 1) is DENIED and DISMISSED with prejudice.

2. The Court finds that its resolution of this habeas matter is not reasonably debatable, and therefore a certificate of appealability will not issue. *See* 28 U.S.C. § 2253(c); Rule 11 of the Rules Governing Section 2254 Cases. If Petitioner files a timely notice of appeal, the Clerk of Court shall forward a copy of the notice of appeal, together with this Order, to the United States Court of Appeals for the Ninth Circuit. Petitioner may seek a certificate of appealability from the Ninth Circuit by filing a request in that court.

DATED:  March 31, 2021



Honorable Ronald E. Bush
Chief U. S. Magistrate Judge